UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KUSHAWN S. MILES,

    Plaintiff,

v.

IONIA CORRECTIONAL FACILITY,
*et al.*,

    Defendants.
                          /

Case No. 1:18-cv-738

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a prisoner in the custody of the Michigan Department of Corrections (MDOC). This matter is now before the Court on motions for summary judgment filed by defendants Larson, Novak, Rykse, Schiebner, and Turner (ECF No. 46) and by plaintiff (ECF No. 50).

    **I.**    **Background**

The Court previously summarized plaintiff's complaint as follows:

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Chippewa Correctional Facility (URF) in Kincheloe, Michigan. The events about which he complains, however, occurred at the Ionia Correctional Facility (ICF) in Ionia, Michigan. Plaintiff sues ICF deputy wardens James Schiebner and John Christiansen; Residential Unit Manager Jeffrey Larson; Prisoner Counselor Marcus Turner; Librarian Joe Novak; Lieutenant S. Rykse; and a John Doe defendant identified as the transfer coordinator at ICF. Those are the only defendants referenced in the body of the complaint. The caption, however, lists the Ionia Correctional Facility as a defendant.

Plaintiff alleges that he was subjected to a tirade peppered with racial epithets from defendant Turner on March 3, 2016. As part of the tirade, Plaintiff claims Defendant Turner informed all of the other inmates in his unit that they would be subject to additional scrutiny and shakedowns because of Plaintiff. Plaintiff, that same day, prepared a grievance against Defendant Turner regarding

1

> the tirade. He also submitted a typewritten complaint to Defendant Schiebner, Defendant Christiansen, other deputy wardens, the civil service department, prisoner affairs, the state police, and the MDOC Director.
>
> Plaintiff offers the complaint and grievance as protected conduct that motivated retaliatory adverse action by the Defendants. According to Plaintiff, Defendants Turner and Larson pressured Plaintiff into dropping the grievance and the complaint or he would suffer consequences including loss of his legal writer job and transfer to a less desirable prison. Plaintiff claims Defendant Turner also wrote a false Class III misconduct against him. The misconduct was ultimately thrown out.
>
> Although Plaintiff's grievance was unremarkable, his complaint was neatly typewritten. The ICF authorities noted that it had been typewritten the same day as the incident and surmised that Defendant must have used a legal writer laptop for his personal complaint. Defendant Novak, at the behest of Defendant Schiebner, wrote a Class II misconduct against Plaintiff for misuse of state property and fired Plaintiff from his legal writer job. Plaintiff claims the misconduct was false. He claims he paid another prisoner to type the complaint for him. He refused to provide the name of the prisoner for the prisoner's protection.
>
> Defendant Rykse served as the misconduct hearing officer. Plaintiff claims Rykse was part of the retaliatory false misconduct scheme. Rykse refused to consider Plaintiff's evidence. He found Plaintiff guilty and imposed 30 days' loss of privileges. Defendant Christiansen then refused to even consider Plaintiff's appeal of Rykse's decision.
>
> Plaintiff claims Defendants Schiebner, Larson, and Turner then signed off on papers that resulted in his transfer to the Michigan Reformatory, a less desirable facility, by the ICF Transfer Coordinator.
>
> Plaintiff seeks a judgment declaring that Defendants violated his constitutional rights. Plaintiff also seeks injunctive relief compelling Defendants to reverse the misuse of state property misconduct. Additionally, Plaintiff demands transfer to one of seven identified MDOC facilities. Finally, Plaintiff seeks compensatory and punitive damages totaling hundreds of thousands of dollars.

Opinion (ECF No. 7, PageID.64-65).

> The Court construed plaintiff's complaint as claiming retaliation:
>
> Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from

>  engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id*. . . .
>
>  Plaintiff alleges that his filing of the grievance and typewritten complaint are protected conduct. He alleges that the loss of his job, punishment for false misconduct, and transfer to a less desirable facility constitute adverse actions. He alleges that the adverse actions were motivated by the filing of the typewritten complaint.

*Id*. at PageID.71-72.   In addition, because plaintiff claims that defendants "accomplished their retaliation by framing him with false evidence" the Court stated that "[a]t this stage of the proceedings, such allegations may suffice to state some type of substantive due process or malicious prosecution claim" *Id*. at PageID.72.

The Court has dismissed defendants ICF and Christiansen.  *See* Orders (ECF Nos. 8 and 38).  In addition, although it is not reflected on the docket sheet, defendants' counsel identified the "unknown party" (sometimes referred to as the "unknown defendant transfer coordinator") as Samantha Farrell.  *See* Order (ECF No. 59).

## II. Motions for summary judgment

### A. Legal standard

Both plaintiff and defendants have moved for summary judgment.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

3

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B. Discussion

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

#### 1. Retaliation

Plaintiff contends that defendants retaliated against him for filing a grievance and complaint regarding his interaction with defendant prison counselor Turner. Although this matter

involves a relatively minor incident (a Class II Misconduct) and the transfer of a single prisoner (plaintiff), the parties have inundated the Court with over 450 pages of briefs and exhibits related to their two dispositive motions. *See* Defendants' Brief and Exhibits (ECF Nos. 36 and 36-1 to 36-14); Plaintiff's Brief (ECF No. 51); Plaintiff's Affidavit and Exhibits 1 to 30 (ECF Nos. 5 and 5-1); Defendants' Affidavits (ECF Nos. 48, 54, and 56); Defendants' Response (ECF No. 58); Plaintiff's Response and Exhibits A to N (ECF Nos. 61 and 61-1); and Defendants' Reply and Attachments (ECF Nos. 67 and 67-1 to 67-5).[1]

The crux of plaintiff's claim is that defendants retaliated against him in violation of his First Amendment rights. According to plaintiff, the retaliation involved three adverse actions: the issuance of a "false" misconduct ticket; the loss of his assignment as a prison legal writer; and, the transfer of plaintiff to a "very strict disciplinary facility." Defendants agree that plaintiff engaged in protected conduct by filing a grievance and complaint. The question before the Court is whether defendants took an adverse action against plaintiff that would deter a person of ordinary firmness from engaging in that conduct. *See Thaddeus-X*, 175 F.3d at 394   The Court concludes that defendants did not take such an adverse action against plaintiff.

    **a.**    **Class II misconduct**

When defendant Deputy Warden Schiebner investigated plaintiff's complaint against defendant Turner, he noticed a problem with the document. Schiebner explained in his affidavit:

5. I received a computer drafted complaint about Prison Counselor Turner.

---

[1] Plaintiff also filed a sur-reply brief which he referred to as an " 'Affidavit of facts' in opposition to defendant's [sic] response to plaintiff's declaration in opposition to defendant's motion for summary judgment" (ECF No. 68).  W.D. Mich. LCivR 7.2(c) provides that "Unless otherwise ordered, any party opposing a dispositive motion shall, within twenty-eight (28) days after service of the motion, file a responsive brief and any supporting materials. The moving party may, within fourteen (14) days after service of the response, file a reply brief. . . The court may permit or require further briefing."  The Court did not permit or require further briefing on this matter.  Accordingly, plaintiff's sur-reply/affidavit is not authorized and will not be considered by the Court.

> 6. Immediately upon seeing the complaint I noticed that the font type was different than what I normally receive from inmates who write complaints.
>
> 7. According to MDOC policy, 01.04.103, inmates are not permitted to use or personally possess computers or data processors. Inmates are allowed to use computers or data processors only as permitted during school or at a work assignment that involves a computer.
>
> 8. The only instrument that any of the inmates have access to, or are allowed to purchase for personal use, is an electronic typewriter that contains a small amount of memory.
>
> 9. It is not possible to change the font type on this device. Even though it has a small memory, when set to produce the typed document, it still physically functions as a mechanical typewriter.
>
> 10. The font generated from the typewriter is visibly different from that of a computer.
>
> 11. Plaintiff was employed as one of three legal writers for ICF.
>
> 12. As a legal writer, plaintiff had access to two computers in the law library.
>
> 13. According to policy, it is strictly prohibited for legal writers or any inmate, to use work computers for their own personal use such as writing grievances or complaints.
>
> 14. I instructed RUM Larson to investigate how the plaintiff had typed the complaint.

Affidavit of James Schiebner (ECF No. 47-4, PageID.308-309).

The investigation commenced on or about March 7, 2016. Plaintiff characterizes the MDOC's investigation as a civil conspiracy directed against him. Compl. at PageID.8. In his complaint, plaintiff alleged that he told RUM Larson "that he had paid another prisoner who owned a word-processor for over 30-years to type out his complaint for him so that he could place his grievance and complaint in the out going mail that night." *Id*. Plaintiff admits that he refused to cooperate in the investigation, and that "[w]hen plaintiff refused to reveal the name and lock of the other prisoner . . . Larson told plaintiff that he hated prisoners who called themselves legal

beagles, because all they do is create problems and troubles for his staff." *Id.* According to plaintiff, Larson became upset and imprudently told plaintiff that "if [plaintiff] did not give him the name of the other prisoner that he would personally see to it that plaintiff is fired from his high paying job." *Id.* at PageID.8-9.

Ultimately, Deputy Warden Schiebner felt that a Class II Misconduct was warranted. In reaching this determination, Schiebner considered the dilemma posed by issuing a misconduct against a prison legal writer:

> 15. Plaintiff claimed he had another inmate who owned a word processor, [sic] type the document for him. He refused to provide that inmate's name.
>
> 16. Based on my personal knowledge of the devices that the inmates are permitted to own and possess in their cell, any word processor is still only an electronic typewriter that does not have the ability to change fonts.
>
> 17. Based upon this knowledge and plaintiff's unwillingness to cooperate or take responsibility, I ordered that he be written a misconduct for misuse of state property. There is no other way that this document was typed.
>
> 18. The decision to write a misconduct against a legal writer is a difficult decision. Legal writers are hard to come by, especially those who are cleared to work with security level 5 prisoners. The legal writers go through extensive training at great expense to the MDOC. This is not a decision that is made lightly.

Schiebner Aff. at PageID.309.

Defendant ICF Librarian Joseph Novak signed the misconduct ticket. Novak explained his portion of the investigation as follows:

> 5. I was approached with a typed document signed by the plaintiff. Because it looked like it had been drafted on a computer, I was asked to check the computer history.
>
> 6. I did check the computer history and did not find any copies of the document, however there won't be any history of the document if it was not saved to the computer. It is possible to type and print a document without saving it. It is also possible to delete history on the computer. If the user deleted the history, it would take a forensic investigation in order to find out if something had been cleared. I

> cannot do a forensic investigation of a computer and we do not have any staff who are capable of doing this investigation.
>
> 7. I reported my findings and was told that because there was no way this document could have come from anywhere else, to write a misconduct ticket on the plaintiff for misuse of state property.
>
> 8. I wrote the misconduct ticket.
>
> 9. The plaintiff alleges that because the time written on the ticket is a time when he was not in the law library, this is proof that this was a false misconduct and that the time and date are required by policy. This is not true. MDOC policy 03.03.105 only requires that a misconduct report is written as soon as possible after the violation is observed or reported. Since misconducts can be reported, you will not always know what time a misconduct occurred. This misconduct was reported to me, I was instructed to write a ticket and according to MDOC policy, I did.
>
> 10. When I originally typed the ticket, I did not place a time on it because I did not know what time the offense occurred. The reviewing officer asked me to put a time and I wrote in the start time for one of the plaintiff's normal work shifts. Before picking the time, I should have double checked his work detail on that day or made note of the fact that the time was unknown. The plaintiff's work schedule is different on different days. That was an error, but that does not mean the plaintiff is innocent of committing the underlying act.
>
> 11. I did not write this misconduct against the plaintiff out of retaliation for him filing a grievance or a complaint. I wrote the misconduct ticket because it appeared the plaintiff had misused state property in violation of MDOC policy.
>
> 12. Because plaintiff was found guilty of the misconduct which related to his work assignment, the plaintiff had to be removed from that work detail.

Affidavit of John Novak (ECF No. 47-8, PageID.339-340).

Novak signed a Class II Misconduct for "Destruction or Misuse of State Property" which provided as follows:

> Prisoner was detailed as a Legal Writer and allowed access to two separate laptop computers; to perform his detail duties. On the afore-mentioned day Prisoner Miles typed off, by all outward appearances word-processed, a complaint regarding the behavior of a facility staff person. A copy is attached. Even though no digital copies were found on either computer or thumb drive; it is clear by all appearances, that Prisoner Miles used one of the legal writer computers - to type a person [sic] letter; for personal benefit.

8

Class II Misconduct (ECF No. 1-1, PageID.21).

Lt. Rykse found plaintiff guilty after a hearing held on March 16, 2016:

> Prisoner Miles attended the hearing process and a not guilty plea was entered on his behalf. I find the Officer credible as to what was written in the misconduct. Prisoner offered no evidence to dispute the misconduct.

Misconduct Hearing Report (ECF No. 1-1, PageID.24). Lt. Rykse gave the following reasons for the finding, "I find Prisoner Miles guilty of the charge, the body of the misconduct support's [sic] the charge as written." *Id*. The MDOC sanctioned plaintiff 30 days loss of privileges for this misconduct. *Id*.

Plaintiff filed an appeal, claiming that Lt. Rykse violated his due process rights by refusing to interview defendant Novak and obtain videos. Misconduct Appeal (ECF No. 1-1, PageID.25). There is no evidence that plaintiff's guilty finding or sanction was reversed on appeal.

The Sixth Circuit has recognized that the issuance of "false charges of misconduct" can be an adverse action, "because charging an inmate with major misconduct when the charges are subsequently found to be unfounded could deter a person of ordinary firmness from exercising his First Amendment rights." *King v. Zamiara*, 150 Fed. Appx. 485, 493-94 (6th Cir. 2005). However, the "false misconduct" rule referenced in *King* does not apply here. The misconduct was not unfounded: MDOC staff performed an investigation before issuing the misconduct ticket; plaintiff refused to cooperate in the investigation blaming an unidentified prisoner as the author of his grievance and complaint; plaintiff was found guilty of that misconduct; and, there is no evidence that the misconduct was overturned on appeal. Plaintiff received a legitimate misconduct for violation of prison rules. In short, there was no adverse action in the form of a "false misconduct."

### b.  Loss of prison work assignment

Plaintiff alleged that he was removed from his prison work assignment ("his high paying paralegal writer's job") due to the "false Class-II Misconduct", all of which was in retaliation for exercising his constitutional rights. Compl. at PageID.9. As discussed, the Class II Misconduct was not "false." Pursuant to MDOC Policy Directive an inmate charged with any misconduct may be temporarily suspended ("laid-in") from a prison work assignment pending the misconduct hearing (¶ BB), and when an inmate is found guilty at the initial misconduct hearing, he shall be considered for reclassification under the policy directive and "shall not be returned to the same assignment if the Classification Director determines it to be a threat to the safety or security of the facility" (¶ CC). *See* PD 05.01.100 (eff. Jan. 6, 2014). In addressing plaintiff's removal from his prison work assignment, defendants rely on the current version of PD 05.01.100 rather than version effective in 2016.[2] While defendants did not accurately recite the reclassification procedure in effect in 2016, plaintiff's retaliation claim fails because there was no "false misconduct."

Plaintiff's brief loss of a prison work assignment was the result of being laid-in after the filing of the misconduct on or about March 10, 2016. *See* Plaintiff's Affidavit (Declaration) (ECF No. 52, PageID.427).[3] Plaintiff was transferred to the Michigan Reformatory (RMI) on March 23, 2016. *Id*. at PageID.428. His transfer was the result of a prison legal writer exchange between the two correctional facilities. Because plaintiff is a legal writer, the MDOC Central Office in Lansing determines his assignment. *See* Scheibner Aff. (ECF No. 47-4, PageID.310) ("MDOC Central Office in Lansing controls how many legal writers are assigned to each facility . . . [and] handles the movement and transfer of all legal writers. . . I have no control

---

[2] *See* Defendants' Brief (ECF No. 47, PageID.253); PD 05.01.100 (eff. March 1, 2019) (ECF No. 47-7).
[3] The Court notes that plaintiff's affidavit is actually a declaration under 28 U.S.C. § 1746.

over where Central Office sends an inmate and I have no control over where the replacement legal writer comes from."). *See also*, Affidavit of Litigation Specialist Jacquine Castillo (ECF No. 47-11, PageID.373-374) ("MDOC Central Office coordinates transfers in order to provide the correctional facility with a replacement legal writer. . . Plaintiff was transferred from Ionia Correctional Facility to the Michigan Reformatory in exchange for a replacement legal writer who was located at the Michigan Reformatory but required a kosher diet, which Ionia Correctional Facility could provide."). In short, plaintiff did not suffer an adverse action related to his prison work assignment. Plaintiff was laid-in after the filing of the misconduct pursuant to the Policy Directives, and then transferred to RMI as part of a legal writer exchange.

        **c.**      **Retaliatory transfer**

Finally, plaintiff's claims that he was subjected to a "retaliatory transfer" from ICF to MRI. Plaintiff's Aff. at PageID.428. The basis for plaintiff's retaliation claim is that he was sent to a very strict disciplinary facility. Plaintiff's claim is without merit. Plaintiff is a convicted felon serving a sentence in Michigan's prison system. The MDOC is responsible for housing thousands of prisoners like plaintiff. The MDOC decides where to place prisoners and when to transfer prisoners. Neither plaintiff, nor any of the other prisoners incarcerated in the state's prison system, have the right to choose their correctional facility.

> A prisoner has no constitutional right to be confined in a particular institution or to enjoy a certain classification. *See Olim v. Wakinekona*, 461 U.S. 238, 245-46, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Meachum v. Fano*, 427 U.S. 215, 228, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) ("[w]hatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all"). In light of these two Supreme Court opinions, plaintiff's implied suggestions that well-behaved prisoners should have some enforceable expectation of remaining at a particular prison is not persuasive. Accordingly, "A transfer to the general population of another prison is not considered sufficiently adverse to deter a person of ordinary firmness from exercising his First Amendment rights." *Jewell v.*

*Leroux*, 20 Fed. Appx. 375, 378 (6th Cir. 2001). *See, e.g., Burton v. Houseworth*, No. 90-2096, 1991 WL 105756 at *2 (6th Cir. June 14, 1991) (rejecting a Michigan prisoner's claim for retaliatory transfer because prisoners do not have a constitutional or state-created right to be incarcerated at a particular facility). "Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers–El v. Barlow*, 412 F.3d 693, 701 (6th Cir.2005). *See, generally, Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) ("the Constitution does not mandate comfortable prisons").

The Sixth Circuit, however, has created a narrow exception to the established general rule that a transfer between prisons cannot form the basis for a First Amendment retaliation claim:

> In *Siggers–El*, we carved out an exception for cases in which foreseeable, negative consequences inextricably follow from the transfer-such as the prisoner's loss of his high-paying job and reduced ability to meet with his lawyer. In these exceptional cases, whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact.

*Jones v. Caruso*, 421 Fed.Appx. 550, 553 (6th Cir.2011) (internal quotation marks, citations and brackets omitted). Thus, to survive summary judgment on a retaliation claim, a prisoner plaintiff needs to make a sufficient showing of the foreseeable, negative consequences that inextricably followed from his transfer. *Id.*, citing *Siggers–El*, 412 F.3d at 701-02. *See also, Hix v. Tennessee Department of Corrections*, 196 Fed. Appx. 350, 358 (6th Cir. 2006) ("the transfer of a prisoner may rise to the level of unconstitutional retaliation where there are foreseeable consequences to the transfer that would inhibit the prisoner's ability to access the courts").

*Henley v. Miller*, No. 1:11-cv-538, 2013 WL 1305285, at *5-6 (March 6, 2013), *R&R adopted*, 2013 WL 1294138 (W.D. Mich. March 28, 2013).

Plaintiff claims that his transfer was an adverse action because RMI had "greater, more severe restrictions and less to no privileges and extreme deplorable inhumane conditions of confinement" which "exacerbated my serious severe chronic care medical conditions." *See* Plaintiff's Aff. (ECF No. 52, PageID.428). Plaintiff's claim is without merit. Prisons are not

hotels.  A transfer to the general population of another prison is not an adverse action for purposes of a retaliation claim. *Jewell*, 20 Fed. Appx. at 378.

In addition, plaintiff's claim that the transfer was an adverse action because he lost his "high paying job" does not meet the narrow scope of a retaliatory transfer claim.  The reference to a "high paying job" in *Siggers-El* involved an access to the court issue, not a "standard of living" issue.

> Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct. *See Smith v. Yarrow*, 78 Fed. Appx. 529, 543-44 (6th Cir. 2003).  In this case, however, the transfer would deter a person of ordinary firmness from engaging in protected conduct, since here, the Defendant [sic] was not only transferred, but also suffered a number of foreseeable consequences that inhibited the Plaintiff's ability to access the courts. As a result of the transfer, the Plaintiff not only lost his high paying job that he needed in order to pay his attorney, but the transfer also made it more difficult for his attorney to visit with or represent him because he was moved further away from her.

*Siggers-El*, 412 F.3d at 701-02.   Furthermore, plaintiff retained his prison work assignment.  As discussed, he was transferred by the MDOC's Central Office as part of an exchange of legal writers between ICF and MRI.  For these reasons, plaintiff's transfer to RMI was not an adverse action.

### 2. False evidence

On initial screening, the Court broadly construed plaintiff's complaint as including "some type" of substantive due process or malicious prosecution claim based upon plaintiff's allegation that defendants "accomplished their retaliation by framing him with false evidence." *Id*. at PageID.72. Because plaintiff's retaliation claim fails, this claim describing how defendants "accomplished" the retaliation fails as well.

### 3.    Conspiracy

As discussed, plaintiff alleged that defendants' actions (*e.g.*, investigating the misconduct, finding plaintiff guilty, and transferring plaintiff), were all part of a conspiracy to retaliate against him. Plaintiff's claim that defendants violated his civil rights by conspiring to retaliate against him in violation of the First Amendment fails because there was no underlying constitutional deprivation. As one court explained:

> A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). In order to prove a civil conspiracy, a plaintiff must demonstrate that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the Plaintiffs of their constitutional rights, and (3) an overt act was committed." *Id.* (citation omitted). However, a civil conspiracy claim is dependent on the underlying constitutional claim. *See Scott v. Stone*, 254 F. App'x 469, 474-75 (6th Cir. 2007) (citing *Torress-Rosado v. Rotger-Sabat*, 335 F.3d at 1, 14 (1st Cir. 2003) ("To demonstrate conspiracy under § 1983, plaintiff must show an actual abridgment of some federally-secured right."); *Vaden v. Village of Maywood*, 809 F.2d 361, 366 (7th Cir. 1987) ("To state a claim for relief under [§ 1983], [plaintiff] must allege no [sic] only that the defendants conspired under color of state law to deprive her of her constitutional rights, but also that she was in fact deprived of those rights.")).

*Ash v. Boone County, Kentucky*, No. CIV.A. 09-190-DLB, 2011 WL 4431820 at *6, n. 6 (E.D. Ky. Sept. 22, 2011). Accordingly, defendants should be granted summary judgment on the conspiracy claim.[4]

### 5.    State law claims

In his complaint, plaintiff alleged "state law tort claims against defendant for violating the constitution and laws of the State of Michigan." Compl. at PageID.5. Plaintiff does

---

[4] While defendants also seek summary judgment for qualified immunity, they have not developed this defense. Defendants' qualified immunity argument consists of one paragraph to support their statement that "[a]s discussed, plaintiff fails to show a constitutional violation of First Amendment retaliation or malicious prosecution." Defendants' Brief (ECF No. 47, PageID.275). Defendants' argument is nothing more than a summary of reasons why plaintiff's case fails on the merits. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

14

not develop these claims. Rather, plaintiff simply lists a number of state constitutional provisions, laws, policy directives and rules, including the Michigan Constitution (Art. 1, §§ 2, 3 and 17), Michigan criminal laws (M.C.L. §§ 750.157a, 750.505, 750.478, 750.147b), M.C.L. § 19.142(e) and (g), various MDOC Policy Directives, and various work rules in the MDOC Employee Handbook. *See* Compl. at PageID.11-12. The Court exercised its supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because those claims appeared to be related to the alleged federal violations. *See* 28 U.S.C. § 1367(a) ("the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy"). The dismissal of plaintiff's federal claims requires the Court to re-examine the issue of supplemental jurisdiction for the state law claims alleged in the complaint. Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *Id.* As discussed, plaintiff's federal claims should be dismissed. In the absence of any federal claim, it is not in the interest of this Court to sort out any "state law tort claims" which may be present in plaintiff's list. These claims should be addressed by the state courts. Accordingly, the Court should decline to exercise supplemental jurisdiction over the state law claims.

### III. Recommendation

For these reasons, I respectfully recommend that defendants' motion for summary judgment (ECF No. 46) be **GRANTED**, that plaintiff's motion for summary judgment (ECF No. 50) be **DENIED**, that plaintiff's state law claims be **DISMISSED** pursuant to 28 U.S.C. § 1367, and that this action be **TERMINATED**.


Dated:  February 21, 2020   /s/ Ray Kent
　　　　　　　　　　　　　　　　　　United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).